# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## GREENSBORO DIVISION

| | |
|---|---|
| SHERYL ANDERSON, ZINA BRENNER, MARY CARTER, TENA DAVIDSON, RAMZI KHAZEN, LILY MARTYN, SHONTELLE THOMAS, and JOSEPH WATSON individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>LABORATORY CORPORATION OF AMERICA HOLDINGS,<br><br>Defendant. | CASE NO. 1:17-cv-911<br><br>COMPLAINT -- CLASS ACTION<br><br>JURY TRIAL REQUESTED |

## CLASS ACTION COMPLAINT

Plaintiffs Sheryl Anderson, Zina Brenner, Mary Carter, Tena Davidson, Ramzi Khazen, Lily Martyn, Shontelle Thomas, and Joseph Watson (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Laboratory Corporation of America Holdings ("LabCorp" or the "Company"), and allege upon information and belief, except as to the allegations that pertain to Plaintiffs and their counsel, which are based on personal knowledge, as follows:

## INTRODUCTION

1.    This is a class action on behalf of a national class defined as all persons who were charged fees for services by LabCorp that were in excess of the negotiated or

#193797v7

mandated fair market value rates established for those services between LabCorp and private or public health insurers (the "Class").

2. The United States is undergoing a healthcare crisis. Healthcare recipients are increasingly being required to absorb greater costs for health care through higher insurance premiums, copays, deductibles, and exclusions.

3. LabCorp operates within the United States healthcare field, engaging in the business of providing laboratory testing services to healthcare recipients worldwide. LabCorp described itself in its Form 10-K for the period ended December 31, 2016, filed with the U.S. Securities and Exchange Commission ("SEC") on February 27, 2017 (the "10-K"), as a "world leading life sciences company that is deeply integrated in guiding patient care, providing comprehensive clinical laboratory and end-to-end drug development services."

4. LabCorp has more than 52,000 employees, and has more than 110 million patient encounters per year. LabCorp serves a broad range of customers, which include managed care organizations, biopharmaceutical companies, governmental agencies, physicians and other healthcare providers, hospitals and health systems, employers, and patients and consumers. According to the 10-K, LabCorp "generated more revenue from laboratory testing than any other company in the world in 2016."

5. LabCorp divides itself into two segments for reporting purposes, LabCorp Diagnostics ("LCD") and Covance Drug Development. LCD is an independent clinical laboratory business, while the Covance Drug Development segment provides drug development solutions around the world, primarily to companies in the pharmaceutical

- 2 -

and biotechnology industries.

6.      This action addresses a particularly pernicious business practice of defendant LabCorp.

7.      LabCorp maintains a price list for diagnostic tests that is grossly disproportionate to fair market value rates, as negotiated or mandated by third-party payers such as private or public (governmental) healthcare insurers ("Benefit Plans"). When a Benefit Plan refuses to cover LabCorp's diagnostic testing, or when a patient lacks insurance, LabCorp charges the patient grossly excessive list prices (or "chargemaster rates") that bear no relationship to fair market value rates, but rather may range from four to twenty times greater than fair market value rates.

8.      These allegations are confirmed by a confidential witness formerly employed by LabCorp. *See* ¶¶ 73-78, *infra*.

9.      Each Plaintiff was charged an exorbitant amount in excess of what they or a Benefit Plan would have paid for the exact same service(s) if the service(s) had been covered by a Benefit Plan:

    a.      Sheryl Anderson was billed $170.00 by LabCorp for three lab tests. Under the Clinical Laboratory Fee Schedule ("CLFS"), which lists the reimbursement rates for various laboratory tests covered by Medicare/Medicaid, LabCorp would have accepted $43.22, or approximately 25.4% of its aggregate chargemaster rates.

    b.      Zina Brenner was billed $273.00 by LabCorp for a "Vitamin D, 25-Hydroxy" test. Under the CLFS, LabCorp would have accepted $40.33, or approximately 14.8% of its aggregate chargemaster rates.

    c.      Mary Carter was billed $711.00 by LabCorp for eight laboratory tests. Under the CLFS, LabCorp would have accepted $188.27, or approximately 26.5% of its aggregate chargemaster rates.

- 3 -

d.  Tena Davidson was billed $425.00 by LabCorp for a single CPT code 80307 laboratory test. Under the CLFS, LabCorp would have accepted $79.81, or approximately 18.8% of its aggregate chargemaster rate.

e.  Ramzi Khazen was billed $459.00 for four laboratory tests. Under the rates negotiated by Golden Rule (a UnitedHealthcare company), Mr. Khazen's insurer, LabCorp would have accepted $69.01, or approximately 15.0% of its aggregate chargemaster rate.

f.  Lily Martyn was billed $4,366.00 by LabCorp for numerous laboratory tests, many of which were undisclosed and aggregated under the line item "ADDITIONAL TEST(S) NOT SHOWN." The chargemaster rates for the invoiced services were excessive in light of what third-party payers would have been charged. As an example, Ms. Martyn's father, Byron Martyn, paid $232.00 on Martyn's behalf for a "Vitamin D, 25-Hydroxy" test, although under the CLFS, LabCorp would have accepted $40.33 for the same test, or approximately 17.4% of its chargemaster rate.

g.  Shontelle Thomas was billed $1,676.59 by LabCorp for a series of fifteen laboratory tests. Under the CLFS, LabCorp would have accepted $431.98, or approximately 25.8% of its chargemaster rate.

h.  Joseph Watson was billed $712.00 by LabCorp for seven laboratory tests. Under the CLFS, LabCorp would have accepted $147.58, or approximately 20.7% of its aggregate chargemaster rates.

10.  Postings on the internet are replete with stories from LabCorp's patients who were denied or without insurance coverage and were overbilled by LabCorp (similar to the allegations raised here by Plaintiffs on behalf of the Class).

11.  Five of the plaintiffs (Anderson, Carter, Davidson, Khazen, and Watson) had private insurance. A sixth plaintiff (Brenner) had public insurance through Medicare. A primary benefit of private and public health insurance is that the insurer negotiates or establishes competitive, fair market value rates with providers, such as LabCorp, on behalf of the insureds. LabCorp is not required to, but chooses to participate in each of these plaintiffs' private and public insurance plans and to accept

- 4 -

the negotiated or established rates as fair value for its services. Plaintiffs, as insureds, are entitled to the benefits of those negotiated, fair market value rates regardless of whether a particular procedure is covered by their insurance contract or Medicare.

12. Compounding the problem of LabCorp's overbilling, LabCorp customarily issues invoices to patients (including Plaintiffs) that are intentionally deceptive and misleading. Specifically, while LabCorp's invoices customarily state the individual chargemaster rate per test for each of multiple tests, they only contain (i) the aggregate third-party payments and/or discounts applied to all of the lab tests, and (ii) the aggregate copays, deductibles or other amounts billed directly to patients.

13. As a result, LabCorp's patients are not informed by LabCorp what, if any, insurance discounts or insurance payments are being applied to each individual lab test, or what amounts, if any, patients are being required to pay as a copay or deductible for each individual lab test.

14. LabCorp also does not inform patients whether certain tests were not covered by their insurer, and whether patients are being required to pay LabCorp's grossly excessive chargemaster rates for those tests versus the fair market value rates that the patient's insurer would pay. Without knowing what they are being charged on a net basis for each test, and whether those rates are reasonable, fair market value rates, plaintiffs are required to pay LabCorp's invoices blindly.

15. Moreover, LabCorp's invoices fail to provide the CPT codes or LabCorp's internal identification code for the tests performed, instead providing only line items with brief descriptions of the services. Line items may also include numerous individual

- 5 -

tests, although this would be unknown to the patient. The failure to disclose CPT codes or even LabCorp's internal identification codes prevents patients from knowing the manner in which they are being billed (*i.e.*, the number and type of tests performed), and that the rates being charged are exorbitant, and grossly above the fair market value of the services rendered.

16.     To make matters worse for individuals who receive these excessive bills (such as Plaintiffs), LabCorp aggressively threatens to, and does, turn the invoices over to collection agencies for collection if unpaid. Plaintiffs and other class members are thus coerced to pay LabCorp's excessive invoices out of fear of harm to their credit rating.

17.     This action seeks recovery by Plaintiffs and the Class of amounts paid by patients to LabCorp in excess of the fair market value rates, and a declaration that Plaintiffs and members of the Class owe LabCorp only amounts equal to the fair market value rates. A fair market value rate for these purposes is defined as "the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts." *See* IRS Publication 561. In the event there is no fair market value rate already established for a particular LabCorp service by looking to the rates paid by Benefit Plans, a fair market value rate can be determined based on a reasonable percentile of the amounts actually received by LabCorp for its services.

18.     This action also seeks transparency in the manner that LabCorp bills patients, and specifically requests an order directing LabCorp to bill patients on a more

particularized basis, providing the specific amounts of any discount, Benefit Plan payment, and/or the patient's financial obligation on a test-by-test basis, rather than solely on an aggregate basis.

19.     Additionally, this action is related to *Bouffard v. Laboratory Corporation of America Holdings*, Case No. 1:17-cv-193-TDS-JLW (M.D.N.C.) (filed March 8, 2017) (the "*Bouffard* Complaint").

20.     The *Bouffard* Complaint was filed on behalf of the same proposed Class consisting of "all persons who were charged fees for services by LabCorp that were in excess of the negotiated or mandated fair market value rates established for those services between LabCorp and private or public health insurers."

21.     LabCorp filed a motion to dismiss the *Bouffard* Complaint on May 22, 2017.  The *Bouffard* parties have completed briefing on that motion, which has been submitted for decision.

22.     Subsequent to the filing of the *Bouffard* Complaint, Plaintiffs' counsel was retained by the Plaintiffs herein to file related claims against LabCorp.

23.     This Complaint is intended merely as a placeholder complaint to toll the running of the statute of limitations.  Plaintiffs are agreeable to staying LabCorp's time to respond to this Complaint until after the determination of the defendant's pending motion to dismiss in *Bouffard*.  Plaintiffs, at that time, anticipate filing a consolidated, amended complaint.  Filing this Complaint at this time will not cause any prejudice to defendant, or improper delay in the prosecution of this action, and will keep the applicable statutes of limitations with respect to Plaintiffs' claims from running without

disrupting the briefing and determination of the pending motion to dismiss in *Bouffard*.

## JURISDICTION AND VENUE

24. Plaintiffs invoke the subject matter jurisdiction of this Court pursuant to 28 U.S.C. §1332(d), which confers original jurisdiction upon this Court over this class action based on diversity of citizenship: (a) there are 100 or more Class members; (b) the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; and (c) at least one Plaintiff and member of the Class is a citizen of a state different from the Defendant.

25. This Court also has supplemental jurisdiction over Plaintiffs' state law and common law claims pursuant to 28 U.S.C. §1367(a).

26. This Court possesses personal jurisdiction over the Defendant based on LabCorp's residence, presence, transaction of business and contacts within this District.

27. Venue is proper in this District pursuant to 28 U.S.C. §1391 because LabCorp maintains its principal place of business in this District, and at all times conducted substantial business in this District.

## PARTIES

### Plaintiffs

28. Ms. Sheryl Anderson maintains her primary residence in Alabama. At all times relevant hereto, Ms. Anderson maintained healthcare insurance through BlueCross BlueShield of Alabama.

29. Ms. Zina Brenner maintains her primary residence in New Jersey. At all times relevant hereto, Ms. Brenner maintained healthcare insurance through Medicare.

- 8 -

30.     Ms. Mary Carter maintains her primary residence in Maryland.  At all times relevant hereto, Ms. Carter maintained healthcare insurance through Cigna.

31.     Ms. Tena Davidson maintains her primary residence in Florida.  At all times relevant hereto, Ms. Davidson maintained healthcare insurance through UMR, a UnitedHealthcare company.

32.     Mr. Ramzi Khazen maintains his primary residence in Texas.  At all relevant times hereto, Mr. Khazen maintained healthcare insurance through Golden Rule (a UnitedHealthcare company).

33.     Ms. Lily Martyn maintains her primary residence in New York.  The lab services at issue were performed for Martyn in North Carolina, which was her primary place of residence at that time.  At all times relevant hereto, Ms. Martyn was uninsured.

34.     Ms. Shontelle Thomas maintains her primary residence in Tennessee.  At all relevant times hereto, Ms. Thomas was uninsured.

35.     Mr. Joseph Watson maintains his primary residence in Alabama.  At all times relevant hereto, Mr. Watson maintained healthcare insurance through BlueCross BlueShield of Alabama.

**LabCorp**

36.     LabCorp is a Delaware corporation with its principal place of business and headquarters located at 358 South Main Street, Burlington, North Carolina.  LabCorp is a publicly traded company, trading on the New York Stock Exchange under the ticker: "LH".

37.     LabCorp is a holding company of numerous subsidiaries and other entities

that provide laboratory testing, patient billing and related services.

## FACTUAL ALLEGATIONS

### The U.S. Laboratory Testing Industry

38.     The U.S. laboratory testing industry is made up of three types of providers: hospital-based, physician-office, and independent clinical and anatomical pathology laboratories.

39.     According to LabCorp's 10-K, the U.S. clinical laboratory testing industry generated revenues of approximately $80 billion in 2016.

40.     Within the laboratory testing industry, there are numerous different lab tests performed for a variety of purposes.  As such, a majority of lab tests performed in the United States have a unique five-digit CPT code, which is commonly used for billing purposes.

41.     Many participants within the laboratory testing industry generate significant revenue by performing lab work on behalf of patients insured by public insurers, *i.e.*, Medicare or Medicaid.  Under Medicare and Medicaid, the maximum reimbursement rates for outpatient clinical laboratory services are disclosed in a publicly available Clinical Laboratory Fee Schedule ("CLFS"), organized by CPT code.

42.     In 2014, Congress passed the Protecting Access to Medicare Act ("PAMA"), which includes the most extensive reform of the CLFS since it was established in 1984.  Under PAMA, beginning in 2017, most rates for laboratory services on the CLFS will be derived using the weighted median private payer rates, net of discounts, rebates, coupons and other price concessions, which reflect the scope of

- 10 -

prices paid across the laboratory industry (subject to certain phase-in limitations on test price reductions during the first several years of implementation). The CLFS provides strong support for what constitutes the fair market value rate for any given lab service.

## LabCorp's Laboratory Testing Business

43.     LabCorp's LCD division is an independent clinical and anatomical pathology laboratory business, and serves a large universe of customers, including managed care organizations, biopharmaceutical companies, governmental agencies, physicians and other healthcare providers, hospitals and health systems, employers, patients and consumers, and independent clinical laboratories.

44.     LCD is made up of a network of primary testing laboratories, specialty testing laboratories, branches, patient services centers, and STAT laboratories, which offer routine and frequently ordered tests that can be performed, with results reported to the physician, quickly.

45.     In its 10-K, LabCorp describes LCD as "an independent clinical laboratory business," that consists of a network of approximately 1,750 patient service centers. " LabCorp's LCD segment employs over 36,000 employees, and processes tests on approximately 500,000 patient specimens daily.

46.     According to LabCorp's 10-K, the Company's most frequently requested tests include, among others, blood chemistry analyses, urinalyses, blood cell counts, thyroid tests, Pap tests, Hemoglobin A1C tests, sexually transmitted disease testing, hepatitis C (HCV) tests, and Vitamin D tests. LabCorp also performs a range of other testing, including wellness testing.

- 11 -

47.     A majority of the lab tests performed by LabCorp are done for patients covered by Benefit Plans.  In accordance with the Benefit Plans, private health insurers, employee organizations, and others sign agreements with LabCorp to provide laboratory testing and other health-related services to participants and beneficiaries of their Benefit Plans.  LabCorp also performs medical testing on patients covered by Medicare and Medicaid (federal and state governmental insurance programs designed to provide health insurance to seniors, the disabled, and the economically disadvantaged), which limits the reimbursement rate for each lab test.

48.     The rates negotiated between LabCorp and the various Benefit Plans are indicative of fair market value rates, *i.e.*, the price agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts.

49.     LabCorp maintains a list of chargemaster rates for each CPT code that are well above what Benefit Plans are willing to pay, and are therefore significantly higher than the fair market value rates of those services.  LabCorp's chargemaster rates are commercially unreasonable and take advantage of Plaintiffs' and Class members' lack of information and bargaining power.

50.     LabCorp's agreements with Benefit Plans are an important inducement to encourage patients, and their doctors, to have LabCorp perform their laboratory tests.

51.     At times, Benefit Plans, to limit their own costs, deny coverage of lab tests because, for example, the Benefit Plans determine that the lab tests are "experimental," "obsolete," or "not medically necessary."

- 12 -

52.     When a patient either lacks insurance coverage or their insurer denies coverage, LabCorp requires that the patient pay the grossly excessive chargemaster rate, a commercially unreasonable amount, rather than the negotiated or government-mandated fair market value rates.

53.     LabCorp is unwilling to negotiate rates with patients, although patients are unaware that they are being charged grossly excessive rates for LabCorp's services at the time the services are rendered.  In other words, individuals, whether insured or not, are forced to pay artificially inflated and egregious chargemaster rates that are not moderate ten to twenty percent premiums over negotiated rates to compensate LabCorp for the inconvenience of billing customers rather than insurers, but may range from four to twenty times more than the fair market value rate typically paid by Benefit Plans.

54.     Here, LabCorp has rejected Plaintiffs' efforts to negotiate their outstanding LabCorp invoices.

55.     As LabCorp acknowledged in its 10-K, "[a] growing portion of revenue is derived from patients in the form of deductibles, coinsurance, copayments, and *charges for non-covered tests*."  [Emphasis added].

56.     Notably, LabCorp's agreements with Benefit Plans do not eliminate the risk to LabCorp associated with receiving payment for its services from individuals because copays and deductibles may be equal to the entire amount of the claim made to a Benefit Plan.  Therefore, payment risk does not justify the egregious premiums LabCorp adds to fair market value rates to establish its chargemaster rates for persons whose Benefit Plans deny coverage.

- 13 -

57.     LabCorp is knowingly and willfully overcharging patients when lab tests are not covered by insurance (whether publicly or privately sponsored), or the patient is uninsured, by requiring patients to pay egregious chargemaster rates.  For example, LabCorp participates in Medicare, although it is not obligated to do so and Medicare limits lab test reimbursement rates to the CLFS.  Nonetheless, LabCorp's participation in Medicare establishes its acceptance of the CLFS rates as an approximation of the fair market value of LabCorp's services.   Yet, when a lab test is performed for an individual with Medicare, and Medicare declines to cover any or all of the lab tests, LabCorp charges the insured patient its chargemaster rate, rather than the CLFS fair market value rate.

58.     Indeed, because Medicare is a Benefit Plan with mandated rates accepted by LabCorp, and Medicare publicly discloses its maximum payment amount for laboratory services (private Benefit Plans, such as affiliates of BlueCross and BlueShield and Cigna, do not), Medicare serves as a reasonable proxy for what other insurers, such as private Benefit Plans, would pay had they covered a laboratory service.

59.     LabCorp has previously settled accusations of similar overcharging conduct.  In 2011, LabCorp entered into a $49.5 million settlement to end a lawsuit by the State of California alleging that LabCorp had charged Medi-Cal, California's medical program for the poor, higher rates for diagnostic services than LabCorp had charged private insurers.  *See State of California ex rel. Hunter Laboratories LLC v. Laboratory Corporation of America*, Case Number 34-2009-00066517 (Sup. Ct. Sacramento Cnty.).

- 14 -

**LabCorp's Manipulative Billing Practices**

60.     The New York Times' Tina Rosenberg criticized health providers' cryptic billing practices, pointing out that "[u]nlike everything else we buy, when we purchase a medical treatment, surgery or diagnostic test, we buy blind.  We do not know the cost of health procedures before we buy.  When we do get the bill, we have no idea what the charges are based on and have no way to evaluate them."  Tina Rosenberg, *Revealing a Health Care Secret: The Price*, THE NEW YORK TIMES (July 31, 2013).

61.     This ability to "hide the ball" has resulted in unfairly inflated chargemaster rates, sometimes referred to as "chargemaster prices," for health services.  "Chargemaster prices are set by the hospital alone and reflect what the hospital would like you to pay.  They are the basis for calculating the discounts given to insurers, and they are generally what's billed to people without insurance." *Id.*  These chargemaster rates, or chargemaster prices, vary widely between health service providers.  As an example of the variation, "[t]he average charge for a joint replacement at a hospital in Ada, Okla., was $5,300.  The comparable charge in Monterey Park, Calif., was $223,000." *Id.*  As is clear, Benefit Plans do not pay the chargemaster rates for health services rendered to plan participants, but instead pay substantially discounted rates.

62.     Ms. Rosenberg's article relies, in part, on a report in The New York Times dated May 8, 2013, summarizing findings from data released for the first time by the Centers for Medicare and Medicaid Services ("CMS").  This data "show[ed] that hospitals charge Medicare wildly differing amounts — sometimes 10 to 20 times what

- 15 -

Medicare typically reimburses — for the same procedure, raising questions about how hospitals determine prices and why they differ so widely." Barry Meier, Jo Craven McGinty and Julie Creswell, *Hospital Billing Varies Wildly, Government Data Shows*, THE NEW YORK TIMES (May 8, 2013). According to the article, neither Medicare nor private insurers pay the chargemaster rates; it is the uninsured and those with inadequate insurance that are forced to pay these rates. As reported in The Times, "the people who can afford it least — those with little or no insurance — are getting hit with extremely high hospitals bills that may bear little connection to the cost of treatment." *Id.*

63. Here, Plaintiffs received invoices from LabCorp after all lab work was performed. In the invoices, LabCorp insisted that Plaintiffs pay LabCorp's grossly exaggerated chargemaster rates for any lab test not covered by insurance, rather than the lower fair market value rates. As a result of this overbilling, LabCorp received payments from individuals far in excess of the reasonable fair market value rates for LabCorp's services.

64. LabCorp also makes it as difficult as possible for patients to understand their bills. On its patient invoices, LabCorp fails to disclose the CPT Codes of the tests it performs. The invoices include only the date of service, a brief description of each service performed, the chargemaster rate for each service, and then blank entries per lab test for adjustments, payments made by Medicare or Medicaid, insurer payments, patient payments (such as copays), and the balance for which the patient is responsible. The detailed information is only provided in the aggregate, not per lab test.

65. LabCorp has structured its invoices to assert the already-existing unequal

- 16 -

bargaining power further in its favor, adding an additional level of deceptive and misleading conduct to the mix by: (a) failing to provide the CPT Codes for each test being billed, which prevents consumers from fully understanding the number and type of tests performed; and (b) aggregating all discounts/adjustments and Benefit Plan payments, which impairs consumers' ability to understand what LabCorp is billing on a test-by-test basis. Due to these practices, the patient cannot determine whether the amounts due from the patient stem from co-pays, deductibles, or chargemaster rates for any test not covered by their Benefit Plan.

66. As a result of how LabCorp's invoices are presented, consumers are forced to pay excessive charges without any understanding as to the basis for those charges. Not only does LabCorp continuously refuse to negotiate with self-paying individuals, but these consumers lack full information as to what and why they are being charged, which vitiates their ability to compare the LabCorp chargemaster rates to the open market. By cutting off the ability to generate information from the open market, consumers are unable to determine the fair market value for LabCorp's services.

67. Moreover, LabCorp, at times, forces patients to provide credit or debit card information in advance of performing any services. The credit or debit card is used to pay the chargemaster rate for uncovered services after billing the patient's insurance provider, leaving the patient without any recourse with respect to excessive charges.

68. If a patient fails to pay the grossly exaggerated chargemaster rate, LabCorp mails multiple copies of invoices and threatening letters over a period of months, demanding payment, wrongly declaring delinquency, threatening to add the patient to a

delinquency list, threatening debt collection, and threatening legal action and liability for costs and expenses.

69.     LabCorp follows through on its threats to use outside debt collection agencies to collect and attempt to collect debts from individual patients.

70.     As a result of LabCorp's overbilling and collection practices, LabCorp often receives payments from individuals far in excess of the reasonable fair market value of its services.

71.     LabCorp's acts and practices target the most susceptible individuals in society:   those who do not have health insurance, have inadequate health insurance, or have very high deductibles.  Nowhere on LabCorp's invoices or public website is there any mention of a company policy to discount lab fees if a patient calls LabCorp to request a discount due to financial hardship.

72.     The practice of LabCorp to overbill patients without insurance coverage, as described herein, is deceptive and unfair, as well as in violation of the implicit agreement between the patient and LabCorp:   any lab testing provided by LabCorp requires payment of the fair market value rate for the service(s) performed.  LabCorp's overbilling practice unjustly enriches LabCorp to the detriment of Plaintiffs and the other Class members.

**Confidential Witness**

73.     Confidential Witness No. 1 ("CW1") is a former LabCorp employee.  For nearly 15 years, beginning in the early 2000s, CW1 worked for LabCorp in a variety of positions, including as District Manager, Specialty Sales Representative, and a Business

- 18 -

Development Executive for the North Central Region. While employed by LabCorp, CW1's primary responsibility was encouraging oncologists and pathologists to use LabCorp's diagnostic services for their patients. CW1 was the primary point of contact between LabCorp and those physicians.

74. According to CW1, LabCorp has multiple sets of fee structures. LabCorp has fee structures for third-party payers, such as insurance companies (*e.g.*, Blue Cross, Aetna, UnitedHealth), that were substantially below the fee structures for "self-pay patients," *i.e.*, persons who either did not have insurance, or whose insurance failed to cover the LabCorp lab testing.

75. CW1 frequently (at least once a month) received communications from his/her clients (the physicians) complaining about the fees charged by LabCorp to self-pay patients. For example, CW1 recalls that LabCorp would charge a self-pay patient $5,500 for a flow cytometry test, whereas it would accept payment of $800 from a third-party payer for the same test, and as little as $300 dollars from hospital clients who wished to be billed directly.

76. Another example, according to CW1, is a CBC (complete blood count) plus routine chemistry profile that would cost LabCorp about $1 to run, and would be billed at $18 to an insurer such as UnitedHealth, but would be billed at approximately $300 to a self-pay patient.

77. LabCorp's practices with respect to overbilling self-pay patients sometimes made it difficult for CW1 to maintain good relationships with his clients. As such, CW1 would speak frequently within LabCorp about these matters. One such

conversation concerning the rates charged to self-pay patients was the week of August 15, 2016, with Roger McCombs, a VP in the North Central division of LabCorp. CW1 was told by Mr. McCombs and others that it was LabCorp's policy to charge the list price fee (the highest fee schedule) to self-pay patients. According to CW1, overbilling self-pay patients was "embedded in the culture of the company."

78.     CW1 had first person knowledge of these allegations. S/he was provided the opportunity to review these allegations and consented to their use in this Complaint.

**Plaintiffs' Claims**

*Sheryl Anderson* **(Alabama)**

79.     At all relevant times, Ms. Anderson maintained healthcare insurance through BlueCross BlueShield of Alabama ("BCBS of AL").

80.     On November 16, 2016, Ms. Anderson had blood drawn by her physician at her doctor's office for purposes of laboratory testing. LabCorp performed the laboratory services on the blood samples.

81.     LabCorp and Ms. Anderson had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by BCBS of AL. Rather, Ms. Anderson reasonably assumed that the procedures would be covered by BCBS of AL, and, at worst, that LabCorp would charge fair market value rates for any uncovered services.

82.     In fact, Ms. Anderson did not know that the laboratory tests were being performed by LabCorp, as opposed to some other lab company.

83.     LabCorp billed Ms. Anderson its inflated chargemaster rates for its

- 20 -

services, demanding payment of $170.00 for three laboratory tests performed on November 16th, none of which were covered by BCBS of AL.

84.     Ms. Anderson's invoice failed to provide the CPT code or LabCorp-specific code for any test purportedly performed.

85.     Under the 2016 CLFS, LabCorp would have accepted $43.22 for the same three lab services, or about 25.4% of its aggregate chargemaster rate, had Ms. Anderson been covered by Medicare.  The charge below demonstrates the egregious discrepancy between what Ms. Anderson was charged and what LabCorp would have accepted from Medicare for the exact same services:

| CPT Code | LabCorp's Chargemaster Rate | 2016 CLFS Maximum Amount |
|---|---|---|
| 85025 | $ 31.00 | $ 10.59 |
| 80053 | $ 41.00 | $ 14.39 |
| 80061 | $ 98.00 | $ 18.24 |
| **TOTALS** | **$ 170.00** | **$ 43.22** |

86.     Ms. Anderson has not yet paid LabCorp for its laboratory services and, as a result, is no longer able to receive medication that she takes, which requires periodic laboratory testing, because LabCorp refuses to perform any additional services until Ms. Anderson pays the full billed amount, rather than the fair market value.

87.     Additionally, Ms. Anderson continues to be subjected to LabCorp's debt collection practices, including referral to the American Medical Collection Agency.

***Zina Brenner* (New Jersey)**

88.     At all relevant times, Ms. Brenner maintained healthcare insurance through Medicare.

89.     On September 8, 2016, Ms. Brenner had blood drawn at a LabCorp facility.  LabCorp then performed laboratory services on the blood samples.

90.     Ms. Brenner reasonably assumed that LabCorp would charge fair market value rates—the same that it charged Medicare—for any uncovered services.

91.     LabCorp billed Ms. Brenner its egregious chargemaster rate of $273.00 for a single laboratory test not covered by Medicare – a "Vitamin D, 25-Hydroxy" test (CPT code 82306) – rather than the fair market value rate.

92.     Ms. Brenner's invoice failed to provide the CPT code or LabCorp-specific code for any test purportedly performed.

93.     Had Medicare covered the CPT code 82306 test, it would have paid an amount substantially less than the chargemaster rate.  Under the 2016 CLFS, LabCorp would have accepted only $40.33, or about 17.4% of its chargemaster rate, had Medicare covered the test.

94.     Ms. Brenner has not yet paid LabCorp for its laboratory services and, as a result, continues to be subjected to LabCorp's debt collection practices.

95.     Medicare did cover five additional line items included on Ms. Brenner's September 8th invoice, which had an aggregate chargemaster rate of $237.00.  Of the aggregate chargemaster rate, LabCorp accepted $36.71 from Medicare, or about 15.5% of LabCorp's aggregate chargemaster rate.

96.     Prior to receiving services, Ms. Brenner signed an acknowledgement printed on LabCorp's form that "If Medicare doesn't pay for laboratory test(s) below, you may have to pay….  We [LabCorp] expect Medicare may not pay for the laboratory

- 22 -

test(s) below…. Medicare does not pay for these tests for your condition." The acknowledgement estimated the cost of Ms. Brenner's lab test as being $273.

97. The acknowledgement however is unenforceable as a matter of law because it was procured through deception. LabCorp's disclosures created the false and misleading impression that Ms. Brenner would only be required to pay that amount that Medicare would have paid if Medicare paid for the laboratory tests. In fact, pursuant to Medicare's fee schedule, which LabCorp committed to accept, Medicare would have only paid LabCorp $40.33 for the Vitamin D test. What Medicare would have paid for the same test was a material fact that a reasonable consumer would need want know prior to signing the acknowledgement.

98. Additionally, LabCorp billed Ms. Brenner in the aggregate, without a breakdown of reimbursements from Medicare (her Benefit Plan) for each individual diagnostic test, although LabCorp was reimbursed by Medicare on an individual test-by-test basis. For example, Ms. Brenner's invoice included the chargemaster rate for each line item, but only the aggregate "Adjustment" and "Medicare/Medicaid Paid" amounts. The failure to disclose the actual amount paid for each line item concealed the fact that Ms. Brenner was actually being charged an excessive rate for a single test not covered by Medicare, while Medicare paid substantially reduced rates, *i.e.*, the fair market value, for the tests it did cover.

### *Mary Carter* (**Maryland**)

99. At all relevant times, Ms. Carter maintained health insurance through Cigna.

100.    On May 27, 2015, Ms. Carter had blood drawn at a LabCorp facility. LabCorp then performed laboratory services on the blood samples.

101.    Ms. Carter reasonably assumed that LabCorp would charge fair market value rates—the same that it charged Cigna—for any uncovered services.

102.    LabCorp billed Ms. Carter its egregious chargemaster rates, totaling $711.00, for drawing blood and performing nine laboratory tests on May 27th.

103.    Ms. Carter's invoice failed to provide the CPT code or LabCorp-specific code for any test purportedly performed.

104.    Had Cigna covered the costs of LabCorp's services, LabCorp would have been paid an amount substantially less for each individual test than its chargemaster rates.

105.    For example, had Medicare covered Ms. Carter's laboratory testing, LabCorp would have accepted only $188.27 based on the 2016 CLFS, or 26.48% of its chargemaster rate.[1]    The chart below demonstrates the egregious discrepancy between what Ms. Carter was charged and what LabCorp would have accepted from Medicare for the exact same services:

---

[1] This figure is only estimated because of LabCorp's practice of withholding the CPT codes for the tests it performs, which is the method of identification by which Medicare provides its maximum payment amounts in the 2016 CLFS.

- 24 -

| CPT Code | LabCorp's Chargemaster Rate | 2016 CLFS Maximum Amount |
|---|---|---|
| 85025 | $ 31.00 | $ 10.59 |
| 80053 | $ 46.00 | $ 14.39 |
| 81001 | $ 31.00 | $ 4.32 |
| 80061 | $ 98.00 | $ 18.24 |
| 86762 | $ 70.00 | $ 19.61 |
| 86735 | $ 89.00 | $ 17.77 |
| 86765 | $ 94.00 | $ 17.55 |
| 86480 | $ 227.00 | $ 84.43 |
| Venipuncture | $ 25.00 | $ 3.00 |
| **TOTAL** | **$ 711.00** | **$ 189.90** |

106.    Under protest, Ms. Carter paid LabCorp the full amount demanded to avoid continuing collection efforts and harm to her credit rating.

107.    Prior to receiving services, Ms. Carter signed an acknowledgement that estimated the cost of Ms. Carter's lab test as being $484.  The acknowledgement however is unenforceable as a matter of law because it was procured through deception.  LabCorp's disclosures created the false and misleading impression that Ms. Carter would only be required to pay that amount that Cigna would have paid if Cigna paid for the laboratory tests.  However, Cigna would have compensated LabCorp much less.  For example, Medicare would have only paid LabCorp $189.90 for Ms. Carter's tests.  What Cigna would have paid for the same test was a material fact that a reasonable consumer would need want know prior to signing the acknowledgement.

### *Tena Davidson* **(Florida)**

108.    At all relevant times, Ms. Davidson maintained healthcare insurance through UMR.

- 25 -

109.   On June 9, 2017, Ms. Davidson had blood drawn by her physician at her doctor's office for purposes of laboratory testing.  Medtox Laboratories Inc., a company which was acquired by LabCorp in 2012, performed the laboratory services on the blood samples.

110.   LabCorp and Ms. Davidson had not reached any agreement in advance with respect to the fees to be charged for any tests performed on her behalf.  Rather, Ms. Davidson reasonably assumed that she would be charged the fair market value rates for any services performed.

111.   In fact, Ms. Davidson did not know that the laboratory tests were being performed by LabCorp, as opposed to some other lab company.

112.   LabCorp billed Ms. Davidson its egregious chargemaster rate of $425.00 for a single laboratory test – a "Compliance Drug Analysis, Urine" test (CPT code 80307).

113.   Ms. Davidson's invoice failed to provide the CPT code or LabCorp-specific code for this test.

114.   Had UMR covered the costs of LabCorp's services, LabCorp would have been paid an amount substantially less than its chargemaster rate.  For example, under the 2017 CLFS, LabCorp would have accepted only $79.81, or about 18.8% of its chargemaster rate, had Medicare covered a CPT code 80307 test.

115.   Ms. Davidson has not yet paid LabCorp for its laboratory services and, as a result, continues to be subjected to LabCorp's debt collection practices.  Notably, LabCorp "reserves the right to refuse laboratory services for failure to pay for past

services" on its invoice.

### *Ramzi Khazen* (**Texas**)

116.   At all relevant times, Mr. Khazen maintained healthcare insurance through Golden Rule (a UnitedHealthcare company).

117.   On June 16, 2017, Mr. Khazen had blood drawn at a Planned Parenthood facility for purposes of laboratory testing.  LabCorp performed the laboratory services on the blood samples.

118.   LabCorp and Mr. Khazen had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by Golden Rule.  Rather, Mr. Khazen reasonably assumed that the procedures would be covered by Golden Rule, and, at worst, that he would be charged fair market value rates for any uncovered services.

119.   LabCorp billed Mr. Khazen its egregious chargemaster rates, totaling $459.00, for performing four laboratory tests that were not covered by Golden Rule.

120.   Mr. Khazen's invoice failed to provide the CPT code or LabCorp-specific code for any test purportedly performed.

121.   Had Golden Rule covered the four tests, it would have paid an amount substantially less than the chargemaster rate.  Pursuant to the negotiated rates Golden Rule provided to Mr. Khazen, LabCorp would have accepted only $69.01, or about 15.0% of its chargemaster rate, from Golden Rule.

122.   The chart below demonstrates the egregious discrepancy between what Mr. Khazen was charged and what LabCorp would have accepted from Golden Rule for the exact same services:

- 27 -

| Test Number | LabCorp's Chargemaster Rate | Insurer's Negotiated Rate |
|---|---|---|
| 1 | $ 168.00 | $ 17.04 |
| 2 | $ 45.00 | $ 2.97 |
| 3 | $ 123.00 | $ 24.50 |
| 4 | $ 123.00 | $ 24.50 |
| **TOTAL** | **$ 459.00** | **$ 69.01** |

123.     Mr. Khazen has not yet paid LabCorp for its laboratory services and, as a result, continues to be subjected to LabCorp's debt collection practices.   Notably, LabCorp "reserves the right to refuse laboratory services for failure to pay for past services" on its invoice.

### *Lily Martyn* **(North Carolina)**

124.     Ms. Martyn was uninsured at all relevant times.

125.     On September 19, 2016, Ms. Martyn had blood drawn by her physician at her doctor's office for purposes of laboratory testing.   LabCorp performed the laboratory services on the blood samples.

126.     LabCorp and Ms. Martyn had not reached any agreement in advance with respect to the fees to be charged for any of LabCorp's laboratory services.   Rather, Ms. Martyn reasonably assumed that LabCorp would charge fair market value rates for its services.

127.     In fact, Ms. Martyn did not know that the laboratory tests were being performed by LabCorp, as opposed to some other lab company.

128.     LabCorp billed Ms. Martyn its inflated chargemaster rate rather than the fair market value of its services, demanding payment of $4,366.00 for performing a

- 28 -

series of laboratory tests.

129.    Ms. Martyn's invoice included eleven individual line items with the corresponding chargemaster rate.  Ms. Martyn's invoice also included a twelfth line item labeled "ADDITIONAL TEST(S) NOT SHOWN," which totaled $1,132.00, or nearly 25.8% of the aggregate chargemaster rate, and the largest single line item on Ms. Martyn's invoice.  This final, aggregate line item failed to disclose any information about the additional tests performed, and the basis for the aggregate charge.

130.    An unexplained $25.00 adjustment was listed on Ms. Martyn's invoice, which reduced the aggregate chargemaster rate from $4,391.00 to $4,366.00.

131.    Ms. Martyn's invoice failed to provide the CPT code or LabCorp-specific code for any test purportedly performed.

132.    Because Ms. Martyn was uninsured, she was responsible for the entire amount owed to LabCorp.

133.    Indeed, LabCorp would have received substantially less than $4,366.00 if a third-party payer (such as Medicare or a private insurer) were responsible for paying for Ms. Martyn's laboratory services.  For example, LabCorp charged Ms. Martyn $232.00 for a "Vitamin D, 25-Hydroxy" test (CPT code 82306).[2]  According to the 2016 CLFS, LabCorp would have accepted only $40.33, or about 17.4% of its chargemaster rate, had Medicare been responsible for payment.

---

[2] Because LabCorp fails to provide a CPT code or LabCorp-specific identification code on its invoices, this CPT code is an estimate based upon the short description provided on LabCorp's invoice to Ms. Martyn.

134. On February 4, 2017, Ms. Martyn's father, under protest, paid on her behalf the entire $4,366.00 LabCorp demanded.

### *Shontelle Thomas* (Tennessee)

135. Ms. Thomas was uninsured at all relevant times.

136. On June 29, 2017, Ms. Thomas had blood drawn at her clinic for purposes of laboratory testing. LabCorp performed the laboratory services on the blood samples.

137. LabCorp and Ms. Thomas had not reached any agreement in advance with respect to the fees to be charged for any of LabCorp's laboratory services. Rather, Ms. Thomas reasonably assumed that LabCorp would charge fair market value rates for its services.

138. In fact, Ms. Thomas did not know that the laboratory tests were being performed by LabCorp, as opposed to some other lab company.

139. LabCorp billed Ms. Thomas its inflated chargemaster rate rather than the fair market value of its services, demanding payment of $1,676.59 in three separate invoices for performing a series of laboratory testing.

140. The first invoice Ms. Thomas received demanded she pay $1,116.00 for an "ANA Comprehensive Panel" test, and $25 for drawing blood. The ANA Comprehensive Panel consists of one CPT code 86225 test, and eight CPT code 86235 tests.

141. The second invoice Ms. Thomas received demanded she pay $46.00 for a "Rheumatoid Arthritis Factor" test (CPT code 86431).

142. The third invoice Ms. Thomas received charged $624.00 for a "Pap IG, Ct-

- 30 -

Nq, HPV-hr" and "Change IG Pap to LB Pap" tests. Without any explanation, the third invoice included a downward adjustment of $109.41. As a result, LabCorp demanded Ms. Thomas pay $514.49. The CPT codes for the tests included in Ms. Thomas's third invoice are 87491, 87591, 87624, 88175, and 88142.

143. None of Ms. Thomas's invoices provided a CPT code or LabCorp-specific code for any test purportedly performed.

144. Because Ms. Thomas was uninsured, she was responsible for the entire amount owed to LabCorp.

145. LabCorp would receive substantially less than its chargemaster rates for the same laboratory services had a third-party Benefit Plan been responsible for Ms. Thomas's invoices. For example, under the 2017 CLFS, LabCorp would have accepted only $215.65 for the ANA Comprehensive Panel test, or approximately 19.3% of its chargemaster rate.

146. Additionally, LabCorp would have been reimbursed only $7.78 for the Rheumatoid Arthritis Factor test, or approximately 16.91% of its chargemaster rate, and $208.55 for the Pap IG, Ct-Nq, HPV-hr and Change IG Pap to LB Pap tests. In all, LabCorp would have been reimbursed only $431.98 for the three invoices, or approximately 25.77% of LabCorp's aggregate chargemaster rate.

147. The chart below demonstrates the egregious discrepancy between what Ms. Thomas was charged and what LabCorp would have accepted from Medicare for the exact same services:

| CPT Code | LabCorp's Chargemaster Rate | 2016 CLFS Maximum Amount |
|---|---|---|
| 87491 | $ - | $ 48.14 |
| 87591 | $ - | $ 48.14 |
| 87624 | $ - | $ 48.14 |
| 88175 | $ - | $ 36.34 |
| 88142 | $ - | $ 27.79 |
| *Total of Above 5 Lines* | *$ 514.59* | *$ 208.55* |
| 86431 | $ 46.00 | $ 7.78 |
| 86225 | $ - | $ 18.85 |
| 86235 (x8) | $ - | 196.80 |
| *Total of Above 2 Lines* | *$ 1,116.00* | *$ 215.65* |
| **TOTALS** | **$ 1,676.59** | **$ 431.98** |

148.    Ms. Thomas has not yet paid LabCorp for its laboratory services and, as a result, continues to be subjected to LabCorp's debt collection practices.

149.    Additionally, LabCorp billed Ms. Thomas in the aggregate, without a breakdown of adjustments provided under Ms. Thomas's third invoice.  For example, Ms. Thomas's third invoice included the chargemaster rates for two line items, which included a total of five CPT code tests, but only the aggregate "Adjustment" amount that had been applied.  The failure to disclose the actual number of tests performed and the amount being charged for each CPT code test concealed the fact that Ms. Thomas was actually being charged an excessive rate, while Benefit Plans paid substantially reduced rates, *i.e.*, the fair market value, for the tests it did cover.

*Joseph Watson* (**Alabama**)

150.    At all relevant times, Mr. Watson maintained health insurance through BlueCross BlueShield of Alabama.

- 32 -

151.    On February 8, 2017, Mr. Watson had blood drawn at his doctor's office for purposes of laboratory testing.  LabCorp performed the laboratory services on the blood samples.

152.    LabCorp and Mr. Watson had not reached any agreement in advance with respect to the fees to be charged for any tests not covered by BlueCross BlueShield of Alabama.  Rather, Mr. Watson reasonably assumed that the procedures would be covered by BlueCross BlueShield of Alabama, and, at worst, that he would be charged fair market value rates for any uncovered services.

153.    LabCorp billed Mr. Watson its egregious chargemaster rates, totaling $712.00, for drawing blood and performing nine laboratory tests on February 8th.

154.    Mr. Watson's invoice failed to provide the CPT code or LabCorp-specific code for any test purportedly performed.

155.    Had BlueCross BlueShield of Alabama covered the costs of LabCorp's services, LabCorp would have been paid an amount substantially less for each individual test than its chargemaster rates.

156.    For example, had Medicare covered Mr. Watson's laboratory testing, LabCorp would have accepted only $147.58 based on the 2017 CLFS, or 20.7% of its chargemaster rate.  The chart below demonstrates the egregious discrepancy between what Mr. Watson was charged and what LabCorp would have accepted from Medicare for the exact same services:

- 33 -

| CPT Code | LabCorp's Chargemaster Rate | 2017 CLFS Maximum Amount |
|---|---|---|
| 85025 | $ 31.00 | $ 10.66 |
| 80053 | $ 46.00 | $ 14.49 |
| 84443 | $ 94.00 | $ 23.05 |
| 80061 | $ 93.00 | $ 15.60 |
| 84403 | $ 155.00 | $ 35.41 |
| 83090 | $ 186.00 | $ 23.14 |
| 84153 | $ 107.00 | $ 25.23 |
| TOTAL | $ 712.00 | $ 147.58 |

157.    Under protest, Mr. Watson paid LabCorp the full amount demanded to avoid continuing collection efforts and harm to his credit rating.

***Other Complaints***

158.    Many consumers have voiced complaints on public forums against LabCorp that are similar to the Plaintiffs' allegations:[3]

a.    Patient in Pennsylvania, posted on June 14, 2017

I am sick and tired of getting ripped off!!! For drawing blood... Which takes less than 5 minutes... They charged my insurance 546.00 dollars!! If that's not bad enough my insurance paid 474.90... So I am left with a bill of 71.10 to pay out of my pocket!! Why is this happening?? For years I went to quest diagnosis and never got charged... Whem they took blood in the dr office. Never got charged!! This is a scam!! I hate labcorp!!! It just sickens me to see me and others being ripped off... And they have bad customer service in hatfield pa 18969!! One person was taking blood... Probley to save money for themselves!! Again labcorp rips people off!!

b.    Patient in Maryland, posted on May 27, 2017

The receptionist checked my GHI card and said it was accepted. She called me to the back of the clinic and stuck a needle in my arm drawing 12 vials of blood. The doctor told me she only needed two. Later they sent me a bill for

---

[3] *Available at*, https://www.complaintsboard.com/labcorp-b119709 (last viewed on Sep. 25, 2017).

- 34 -

1600 dollars saying GHI didnt accept. The receptionist forced service through lies telling me i was covered by my insurance. Also i did not even know how much these blood tests cost. She was supposed to check my insurance and make sure they cover. Prices should be disclosed to the patient too. She didn't do either of these. I paid $600 toward the bill. I cannot pay anymore. I feel they were negligent and tricked me into this service.

c.    Patient in New Jersey, posted on December 24, 2016

I received a LabCorp bill for Vitamin D, 25 Hydroxy lab test for $273.00. I was told at the time of my test it is coded correctly and Medicare will pay for it. The test was done on September 8, 2016[.] It's funny how [their] other $510.00 charges in the same blood test were paid by Medicare for $36.71. Now I found the excel net fee schedule form LabCorp and I see that the net fee they charge providers is $18.94. Why should I have to be charged almost 15 times more. In any other industry that's called racketeering. I would pay the reasonable $18.94 but LabCorp will not answer my emails. My doctor says her prescription is correct whatever that means. LabCorp will not respond to my customer service emails thus I guess they are waiting for the bill to go to their in house collection people. I will demand a hearing. Realistically I would love to go to Washington and produce all these documents at a hearing on the ridiculous charges from medical providers that only those that cannot afford it pay.

d.    Patient in North Carolina, posted on December 8, 2011

I had health insurance with Horizon Blue Cross Blue Shield of New Jersey (Horizon). In network outpatient lab work was provided by Laboratory Corporation of America Holdings (Labcorp). Due to the limitations of the policy, there was a limit of $500.00 per year for this benefit. During October 2010, I visited my primary doctor, blood was drawn and sent to Labcorp. Horizon was billed for four (4) tests - two (2) were paid in full, one was paid partially and the last was not paid. The Explanation of Benefits sent to me did not show the remaining balance for out-patient testing. For the partially paid test, Horizon was billed at $104.00, allowed amount $20.21, paid $1.85. The last test was billed at $66.00, allowed amount $11.68, not paid. When this first started, I offered to pay the unpaid contract amounts of $30.04 - not accepted. I see no reason why I should pay more than five times the contract amount for a test. Also, I have not worked since January 2008 and can't afford to pay $66.00.

- 35 -

159.    Additional complaints provide:[4]

a.      Posted on September 13, 2017

My doctor's office requested several lab tests for recent health problems I have. I am required to use Lab Corp by my insurance company. I went to Lab Corp and gave them my insurance card, ID, and a copy of the doctor's orders. They input my information and coverage to the system and presented me... with an estimated financial responsibility sheet which indicated all services as "Covered Services" and gave a rough amount as $71.04, there is a section on the form for "non-covered services" which is blank. I authorized the testing and gave my credit card information for the balance of $71.04. About a month after services were performed I received a bill from Lab Corp for $390, of which they had already debited $71.04 from my account. One of the tests was billed/charged as $390 as a non-covered service. I called Lab Corp to make a complaint and ask what they could offer me as resolution and I was told that the best they could offer was a 20% discount, leaving my total bill at $312. I also inquired as to why they would provide me with a financial responsibility estimate and list that this test was a covered service when in fact there estimate of $33.40 for the test and the fact that it was a covered test was completely inaccurate. There was no explanation for that and they simply indicated that the statement provided was an "estimate" and it was not guaranteed to be 100% accurate. In this case the "estimate" was false and completely misleading and caused me to authorize a $390 test that I would never have agreed to otherwise if it had been properly disclosed to me.

b.      Posted on August 5, 2017

RE: Invoice ******** Doctor ordered 3 lab tests. Collected in Dr Office. My insurance has paid two or the three at negotiated rates. Labcorp has accepted those payments The 3rd test Procedure Code 80307 was denied by the insurance company as "medically unnecessary" As plan administrator and... benefits manager for my corporation's five health plans, I'm familiar with billing practices and insurance payments. So when we received a bill from Labcorp for $204.33 for ** *****, I felt that is we exceptionally high and somewhat unethical. The CMS approved rate for the ** ***** is only $61.02. I called the ************** in an attempt to discuss it and setup payment but was told that the best that Labcorp could do was to waive 15% of a bill which which is over 333% more than the negotiated rate. I even offered to pay the

[4] *Available at*, https://www.bbb.org/greensboro/business-reviews/laboratories-medical/laboratory-corporation-of-america-in-burlington-nc-1656/reviews-and-complaints (last viewed on Sep. 25, 2017).

135% of the negotiated rate which is 'reasonable and customary' in the industry. I feel that it is a bit suspect, given that the collection was made in the doctor's office and sent to Labcorp for processing. The Doctor's business office was closed at the end of the appointment so the patient didn't have a chance to even find out if the test would be covered.

c.      Posted on March 10, 2017

10 Nov 2015 Dr ****** gave me a request for blood tests as part of my annual physical. A copy of that request is forwarded. Lab Corp sent a bill for $1,365.00 for blood tests not on Dr. ******'s request. Blood tests our insurance would not cover. I provided Lab Corp with a copy of Dr. ******'s... request and asked Lab Corp to resubmit to our insurance. I continued to speak with Lab Corp but they continue to send me the bill for $1,365. and have not submitted the correct request from Dr. ****** to our insurance for coverage.

d.      Posted on January 23, 2017

I recently had a drug screen done as part of my medical training. I, having health insurance, elected to first attempt to bill the service to my insurance to help offset the cost. My insurance later rejected the charge as a non-covered service. Lab Corp then sends me a bill for $381 [] for... the service. Fellow colleagues who paid cash for the exact same lab done at the exact same providers office were only billed $90. This represent a 236% increase. After calling Labcorp they say this is their "cash pay" discount. Labcorp does not make it known they charge more for services billed to insurance so there is no way for the consumer to know if attempting to utilize their health insurance is even worthwhile. Secondly a 236% or $291 increased charged simply because a customer has an insurance is deceitful at best and at worse abusive and fraudulent. Again, a $291 markup to simply reject an insurance claim is absurd.

e.      Posted on December 29, 2016

Date of Service 1-5-2016. Lab Corp submitted to ******** 2 wrong diagnosis along with services of $334.00 of which a previous Lab had a charge of $58. Lab Corp submitted to ******** diagnosis codes of ****** (other Malaise) & ***** (other hyperlipidemia). ******** denied coverage for the charges of... $334.00 as the above are not covered diagnosis. ******** did pay for charges of $58.62 in 2014 for the same 3 tests.

f.      Posted on November 7, 2016

- 37 -

LabCorp has billed me $567 for lab work that has a fair market value of $179, evidenced by internet offers that use LabCorp for the bloodwork. On 6/2/16 I had bloodwork performed at LabCorp in Fairhope, AL, as a prerequisite for an internship at a hospital. This bloodwork was not covered by BCBS even though my doctor believed it would be. I have received several bills and collections threats, concerning invoice number XXXXXXXX. This invoice is for $567. A quick internet search finds that the bloodwork I received would cost $179 at the same location, if purchased online. The online price does not require any form of membership. LabCorp's price gouging is unconscionable and potentially illegal. I have offered in writing and on a recorded call to pay the FMV of the services received.

g.     Posted on October 17, 2016

LabCorp invoices consumer 7 times the amount they will accept from ********** for the same exact test if ********** denies it vs approves it. I asked my Dr. office for an annual physical - which was supposedly free under my health plan with **********. The Dr. office asked me to come in on 6/15... for blood/urine tests - a week before my physical on 6/22. I learned later the Dr. office sent these tests out to LabCorp. Out of several tests run on 6/15, one of them (Procedure Code: ***************************) was denied by ** because they decided it's Not Covered under preventative care. But on 6/22 the Dr. didn't like one of my numbers on that test & had me take it again. Weeks later I was informed that ** Denied my coverage for the 6/15 test & I was billed the full list price of $72 by LabCorp. ** said the claim from 6/22 was covered because it was for medical reasons... So they discounted that $72 bill from LabCorp by $61.85 (86% discount) to make it only $10.15, of which I paid my 20% copay of $2.03. How is it possible that LabCorp will accept $10.15 for the same exact test (code *****) on 6/22 but expect me, the consumer, to pay 7X the rate of $72 when they did the test on 6/15. This is outrageous! I tried calling LabCorp initially to get a lower rate, but they said that's just how it is... I also tried appealing to my Dr's office, and **, and my employer's HealthAdvocate to get some help changing the bill to a rational amount. But everyone just says that's how insurance works... Finally, today I called LabCorp back because they're about to sent the $72 invoice to a 3rd party collection agent & hurt my credit score. Supposedly, the most their customer service is authorized to discount a bill is 5%. So I paid the $68.40 so it won't go to collections. But this is still outrageous that they will nail the consumer with 7X the amount they will accept from ** for the SAME EXACT PROCEDURE done one week apart. This seems like an unfair & deceptive trade practice! I never agreed to pay LabCorp anything in June & didn't even know they were who the Dr office farmed these tests out to. I just asked my Dr for an annual physical. But now they have the power to charge

me $72 for a test that they normally get paid $10.15 for. What is to stop them from charging $720 for a $10 test the next time, or $7,200?

h.      Posted on August 23, 2016

Excessive charges for one blood test. In August of 2015 I went to my doctor to get my thyroid checked, he was covered by my insurance. He said he would need a blood sample and that the lab was in his office. I did as instructed by my doctor and had my blood drawn. On this date of August 27,2016... (one year later) I received an invoice from Labcorp stating that I owe $521.00 for my one blood draw for one test. I could not believe that one test cost $521.00 and that I received a bill a year later. I am a student and I barely can afford my cost of living. I called to see if they could settle with $150.00 because that is all I had in my savings and the employee on the phone said that she could only give me a discount off the bill but it still would be over $400.00. I believe this company is price gouging patients. I have insurance but they still won't settle on my co-pay. I was not told by Labcorp that I would have to pay $521.00 for my test, if I knew that I would of went somewhere else for the test. This company is not honest and I would like for them to settle for my co-pay.

160.    Plaintiffs' counsel continues to be contacted by class members expressing interest in joining this action as named plaintiffs.  Plaintiffs reserve the right to propose subsequent amendments to add plaintiffs, including plaintiffs from different states, to the complaint.

## CLASS ACTION ALLEGATIONS

161.    Plaintiffs bring this action on behalf of themselves and on behalf of the national Class, defined above as all persons who were charged fees for services by LabCorp that were in excess of the negotiated or mandated fair market value rates established for those services between LabCorp and private or public health insurers.  In the event there is no fair market value rate established for a particular LabCorp service by arm's-length agreement between LabCorp and Class members' Benefit Plans or by public health insurers, Plaintiffs seek a declaration as to a reasonably comparable fair

- 39 -

market value rate. A fair market rate for these purposes is defined as "the price that would be agreed on between a willing buyer and a willing seller, with neither being required to act, and both having reasonable knowledge of the relevant facts." *See* IRS Publication 561. A fair market value rate can be determined based on a reasonable percentile (such as the 51st percentile) of the amounts actually received by Quest from customers and Benefit Plans for its services. Excluded from the Class is LabCorp, its parents, subsidiaries, officers, directors, employees, partners, and co-ventures.

162. Plaintiffs also brings this action on behalf of the following Sub-Classes:

a. All persons residing in the State of North Carolina who were charged fees for services by LabCorp that were in excess of the fair market value rates established for those services, as negotiated or mandated by or between LabCorp and private or public health insurers (the "North Carolina Sub-Class") (Lily Martyn);

b. All persons residing in the State of Alabama who were charged fees for services by LabCorp that were in excess of the fair market value rates established for those services, as negotiated or mandated by or between LabCorp and private or public health insurers (the "Alabama Sub-Class") (Sheryl Anderson and Joseph Watson);

c. All persons residing in the State of Florida who were charged fees for services by LabCorp that were in excess of the fair market value rates established for those services, as negotiated or mandated by or between LabCorp and private or public health insurers (the "Florida Sub-Class") (Tena Davidson);

d. All persons residing in the State of Maryland who were charged fees for services by LabCorp that were in excess of the fair market value rates established for those services, as negotiated or mandated by or between LabCorp and private or public health insurers (the "Maryland Sub-Class") (Mary Carter);

e. All persons residing in the State of New Jersey who were charged fees for services by LabCorp that were in excess of the fair market value rates established for those services, as negotiated or mandated by or between LabCorp and private or public health insurers (the "New Jersey Sub-Class") (Zina Brenner);

f. All persons residing in the State of Tennessee who were charged fees for services by LabCorp that were in excess of the fair market value rates established for those services, as negotiated or mandated by or between LabCorp and private or public health insurers (the "Tennessee Sub-Class") (Shontelle Thomas); and

g. All persons residing in the State of Texas who were charged fees for services by LabCorp that were in excess of the fair market value rates established for those services, as negotiated or mandated by or between LabCorp and private or public health insurers (the "Texas Sub-Class") (Ramzi Khazen).

163. This action is brought as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, sub-sections 23(a) and 23(b)(2) and/or (b)(3). The Class and Sub-Classes (collectively, the "Class") satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule

23.

164. **Numerosity**. The members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members can be determined only by appropriate discovery, Plaintiffs believe that there are thousands of Class members residing throughout the United States. Indeed, LabCorp claims to have more than 110 million patient encounters per year, and to process tests on approximately 500,000 patient specimens *daily*.

165. Because of the geographic dispersion of Class members, there is judicial economy arising from the avoidance of a multiplicity of actions in trying this matter as a class action.

166. **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs have no interests that are adverse or antagonistic to those of the Class. Plaintiffs' interests are to obtain relief for themselves and the Class for the harm arising out of the violations of law set forth herein.

167. **Commonality**. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

> a. Whether LabCorp violated the North Carolina Unfair and Deceptive Trade Practices Act, Alabama Deceptive Trade Practices Act, Florida Deceptive and Unfair Trade Practices Act, Maryland Consumer Protection Act, New Jersey Consumer Fraud Act, Tennessee Consumer Protection Act of 1977, and Texas Deceptive Trade Practices-Consumer Protection Act;

- 42 -

b.  Whether LabCorp breached its implied contractual obligations to Plaintiffs and the Class;

c.  Whether the amount LabCorp is entitled to charge patients is equivalent to the fair market value rates of its services;

d.  Whether LabCorp billed Plaintiffs and members of the Class amounts in excess of the fair market value rates of its services;

e.  Whether LabCorp deceived Plaintiffs and members of the Class by billing for services at excessive rates, without disclosing that it had agreed with Benefit Plans to accept negotiated rates that reflect the fair market value rates of its services;

f.  The proper measure of damages to be paid to Plaintiffs and the Class;

g.  Whether Plaintiffs and the Class are entitled to injunctive or other equitable relief to remedy LabCorp's continuing violations of law alleged herein; and

h.  Whether LabCorp has been unjustly enriched by their inequitable and unlawful conduct, and if so, whether LabCorp should be forced to disgorge inequitably obtained revenues or provide restitution.

168.  **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in complex and consumer class action litigation.

169.  A class action is superior to all other methods for the fair and efficient

adjudication of this controversy. Since the damages suffered by the members of the Class may be relatively small in comparison to the expense and burden of individual litigation, it is virtually impossible for Plaintiffs and members of the Class to individually seek redress for the wrongful conduct alleged herein.

170.    In addition, as alleged herein, LabCorp has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

171.    The Class is readily definable, and prosecution of this action and a class action will reduce the possibility of repetitious litigation.

172.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

173.    Reliance among Class members may be assumed because no one would knowingly pay an excessive rate.

**FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING**

174.    LabCorp has engaged in fraudulent, misleading and deceptive efforts to conceal the true nature of its unlawful conduct from Plaintiffs and the Class. LabCorp intended to and has in fact accomplished their concealment by their active misrepresentations and omissions, as described herein.

175.    Specifically, LabCorp mails invoices to patients that groups all lab work charges together, and identifies only the aggregate insurance discounts and third-party payments. LabCorp fails to inform patients of the specific instances where a health insurer denies coverage, and patients are not provided with the discounts negotiated by

- 44 -

the Benefit Plans.

176.     LabCorp also fails to disclose the CPT codes for the tests it purports to have performed, preventing consumers from being able to identify potential fair market values for the lab testing being billed for.

177.     Due to LabCorp's fraudulent concealment, many class members are unaware of their claims against LabCorp.

178.     This lack of knowledge is not due to any fault or lack of diligence on their part, but rather due entirely or substantially to LabCorp's acts designed to conceal and hide the true and complete nature of its unlawful and inequitable conduct.

## CAUSES OF ACTION

### COUNT I
**Violations of the North Carolina Unfair and Deceptive Trade Practices Act
N.C. Gen. Stat. §§ 75-1, *et seq.*
(On behalf of Plaintiffs, the Class, Lily Martyn and the North Carolina Sub-Class)**

179.     Plaintiffs repeat and re-allege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

180.     LabCorp's laboratory testing services are "in or affecting commerce" under N.C. Gen. Stat. § 75-1.1(a).

181.     The North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") declares unlawful any "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

182.     As alleged herein, LabCorp has engaged in unfair or deceptive acts or practices affecting commerce in connection with its improper billing and debt collection

- 45 -

for laboratory testing and other services, including the practice of overbilling individual consumers well above fair market value and failing to disclose CPT codes and/or LabCorp's internal identification codes for the laboratory tests purportedly performed. These acts and practices violate the UDTPA.

183.    Each invoice sent by LabCorp that overbills Plaintiffs and each member of the Class and North Carolina Sub-Class establishes a separate offense of the UDTPA pursuant to N.C. Gen. Stat. § 75-8.

184.    Plaintiffs and the other members of the Class and North Carolina Sub-Class have been and continue to be injured as a direct and proximate result of LabCorp's violations of the UDTPA.

185.    Plaintiffs and the other members of the Class and North Carolina Sub-Class either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value rate.

186.    The laws of North Carolina are applicable to the claims on behalf of a nationwide class raised in this Count.

187.    LabCorp's unfair and deceptive acts and practices, as described above (*i.e.*, its improper billing and collection practices), were performed from within the state of North Carolina, and caused injury to each member of the nationwide Class.

188.    North Carolina has the most significant relationship to the deceptive acts and practices complained of herein, and has a substantial interest in regulating the deceptive conduct of LabCorp from within its borders.

- 46 -

189.    Plaintiffs are entitled to pursue a claim on behalf of the national Class and North Carolina Sub-Class against LabCorp seeking actual damages and treble damages pursuant to N.C. Gen. Stat. § 75-16, which provides

> [i]f any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict.

190.    Plaintiffs and the other members of the Class are also entitled to seek attorney's fees for bringing this action to remedy LabCorp's violations of the UDTPA, under N.C. Gen. Stat. § 75-16.1.

## COUNT II
### Violations of the Alabama Deceptive Trade Practices Act,
### Ala. Code §§ 8-19-1, et seq.
### (On behalf of Plaintiffs Anderson and Watson and the Alabama Sub-Class)

191.    Plaintiffs Sheryl Anderson and Joseph Watson repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

192.    LabCorp is a "person" as defined in the Alabama Deceptive Trade Practices Act ("ADTPA").  Ala. Code § 8-19-3(5).

193.    LabCorp's laboratory testing constitutes a "service," and thus "trade or commerce," under the ADTPA.  Ala. Code § 8-19-3(7)-(8).

194.    The ADTPA prohibits "deceptive acts or practices in the conduct of any trade or commerce," which includes "[m]aking a false or misleading statement of fact

- 47 -

Case 1:17-cv-00911-TDS-JLW   Document 1   Filed 10/10/17   Page 47 of 61

concerning the reasons for, existence of, or amounts of, price reductions" and "[e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5(11) & (27).

195.   As alleged herein and above, LabCorp has engaged in false, misleading, deceptive, and unconscionable acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including the practice of overbilling individual consumers well above fair market value and failing to disclose CPT codes and/or LabCorp's internal identification codes for the laboratory tests purportedly performed.  These acts and practices violate the ADTPA.

196.   Plaintiffs Anderson and Watson and the other members of the Alabama Sub-Class have been and continue to be injured as a direct and proximate result of LabCorp's violations of the ADTPA.

197.   Plaintiffs Anderson and Watson and the other members of the Alabama Sub-Class either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value.

198.   Plaintiffs Anderson and Watson are entitled to pursue a claim on behalf of the Alabama Sub-Class against LabCorp under Ala. Code § 8-19-10 for statutory damages, treble damages, and attorney's fees and costs to remedy LabCorp's violations of the ADTPA.

- 48 -

**Violations of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. Ann. §§501.201, *et seq.***
**(On behalf of Plaintiff Davidson and the Florida Sub-Class)**

199.   Plaintiff Tena Davidson herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

200.   LabCorp's lab services constitute "trade or commerce" as defined in Fla. Stat. Ann. §501.203(8).

201.   The Florida Deceptive and Unfair Trade Practices Act ("DUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. Ann. §501.204(1).

202.   As alleged herein and above, LabCorp has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in connection with its improper billing and debt collection for laboratory testing and other services, including the practice of overbilling individual consumers well above fair market value and failing to disclose CPT codes and/or LabCorp's internal identification codes for the laboratory tests purportedly performed.  These acts and practices violate the DUTPA.

203.   Plaintiff Davidson and the other members of the Florida Sub-Class have been and continue to be injured as a direct and proximate result of LabCorp's violations of the DUTPA.

204.   Plaintiff Davidson and the other members of the Florida Sub-Class either

- 49 -

(i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value.

205.    Plaintiff Davidson is entitled to pursue a claim on behalf of the Florida Sub-Class against LabCorp pursuant to Fla. Stat. Ann. §§501.2105 and 501.211 for damages, equitable relief, and attorney's fees and costs to remedy LabCorp's violations of the DUTPA.

**COUNT IV**
**Violations of the Maryland Consumer Protection Act,**
**Md. Code Ann., Com. Law §§13-101, *et seq.***
**(On behalf of Plaintiff Carter and the Maryland Sub-Class)**

206.    Plaintiff Mary Carter herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

207.    LabCorp is a "person" as defined in the Maryland Consumer Protection Act ("MD-CPA"). Md. Code Ann., Com. Law §13-101(h).

208.    The MD-CPA prohibits "any unfair or deceptive trade practice," which includes "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers," "[f]ailure to state a material fact if the failure deceives or tends to deceive," and "[f]alse or misleading representation of fact which concerns…[t]he reason for the existence or amount of a price reduction." Md. Code Ann., Com. Law §§13-301, 303.

209.    As alleged herein and above, LabCorp has engaged in an unfair or

- 50 -

deceptive trade practice in connection with its improper billing and debt collection for laboratory testing and other services, including the practice of overbilling individual consumers well above fair market value and failing to disclose CPT codes and/or LabCorp's internal identification codes for the laboratory tests purportedly performed. These acts and practices violate the MD-CPA.

210.    Plaintiff Carter and the other members of the Maryland Sub-Class have been and continue to be injured as a direct and proximate result of LabCorp's violations of the MD-CPA.

211.    Plaintiff Carter and the other members of the Maryland Sub-Class either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value.

212.    Plaintiff Carter is entitled to pursue a claim on behalf of the Maryland Sub-Class against LabCorp under Md. Code Ann., Com. Law §13-408 for damages and attorney's fees and costs to remedy LabCorp's violations of the MD-CPA.

### COUNT V
**Violations of the New Jersey Consumer Fraud Act,**
**N.J. Stat. Ann. §56:8-1,** *et seq.*
**(On behalf of Plaintiff Brenner and the New Jersey Sub-Class)**

213.    Plaintiff Zina Brenner repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

214.    LabCorp is a "person" as defined in the New Jersey Consumer Fraud Act ("NJCFA").  N.J.S.A. §56:8-1(d).

215.    The NJCFA states in pertinent part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practices....

N.J.S.A. §56:8-2.

216.    As alleged herein and above, LabCorp has engaged in unconscionable commercial practices, deception, and fraud in connection with its improper billing and debt collection for laboratory testing and other services, including the practice of overbilling individual consumers well above fair market value and failing to disclose CPT codes and/or LabCorp's internal identification codes for the laboratory tests purportedly performed.  These acts and practices violate the NJCFA.

217.    Plaintiff Brenner and the New Jersey Sub-Class have been and continue to be injured as a direct and proximate result of LabCorp's violations of the NJCFA.

218.    Plaintiff Brenner and the other members of the New Jersey Sub-Class either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value.

219.    Plaintiff Brenner and the New Jersey Sub-Class are entitled to pursue a claim against LabCorp pursuant to N.J.S.A. §§56:8-2.11, 56:8-2.12 and/or 56:8-19 for

- 52 -

damages, treble damages, equitable relief, and attorney's fees and costs to remedy LabCorp's violations of the NJCFA.

**COUNT VI**
**Violations of the Tennessee Consumer Protection Act of 1977,**
**Tenn. Code §§ 47-18-101,** *et seq.*
**(On behalf of Plaintiff Thomas and the Tennessee Sub-Class)**

220.   Plaintiff Shontelle Thomas herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

221.   LabCorp is a "person" as defined in the Tennessee Consumer Protection Act of 1977 ("TN-CPA").  Tenn. Code § 47-18-103(13).

222.   LabCorp's laboratory testing services constitute "trade" or "commerce" under the TN-CPA.  Tenn. Code § 47-18-103(19).

223.   The TN-CPA prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," which includes "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."  Tenn. Code § 47-18-104(11).

224.   As alleged herein and above, LabCorp has engaged in an unfair or deceptive act or practice in connection with its improper billing and debt collection for laboratory testing and other services, including the practice of overbilling individual consumers well above fair market value and failing to disclose CPT codes and/or LabCorp's internal identification codes for the laboratory tests purportedly performed. These acts and practices violate the TN-CPA.

225.   Plaintiff Thomas and the other members of the Tennessee Sub-Class have

- 53 -

been and continue to be injured as a direct and proximate result of LabCorp's violations of the TN-CPA.

226.    Plaintiff Thomas and the other members of the Tennessee Sub-Class either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value.

227.    Plaintiff Thomas is entitled to pursue a claim on behalf of the Tennessee Sub-Class against LabCorp under Tenn. Code § 47-18-109 for actual damages, treble damages, equitable relief, and attorney's fees and costs to remedy LabCorp's violations of the TN-CPA.

**COUNT VII**
**Violations of the Texas Deceptive Trade Practices-Consumer Protection Act,**
**Tex. Bus. & Com. Code §§ 17.41,** *et seq.*
**(On behalf of Plaintiff Khazen and the Texas Sub-Class)**

228.    Plaintiff Ramzi Khazen herein repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

229.    LabCorp is a "person" as defined in the Texas Deceptive Trade Practices-Consumer Protection Act ("DTP-CPA").  Tex. Bus. & Com. Code § 17.45(3).

230.    LabCorp's laboratory testing services constitute "trade" or "commerce" under the DTP-CPA.  Tex. Bus. & Com. Code § 17.45(6).

231.    The DTP-CPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," which includes, *inter alia*, "making false or misleading statements of fact concerning the reasons for, existence of, or amount of

price reductions," and "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." Tex. Bus. & Com. Code § 17.46.

232.   Additionally, a cause of action exists under the DTP-CPA for "any unconscionable action or course of action by any person" that causes "economic damages or damages for mental anguish." Tex. Bus. & Com. Code § 17.50(a)(3).

233.   As alleged herein and above, LabCorp has engaged in false, misleading, and/or deceptive acts or practices, as well as an unconscionable action or course of action, in connection with its improper billing and debt collection for laboratory testing and other services, including the practice of overbilling individual consumers well above fair market value and failing to disclose CPT codes and/or LabCorp's internal identification codes for the laboratory tests purportedly performed.  These acts and practices violate the DTP-CPA.

234.   Plaintiff Khazen and the other members of the Texas Sub-Class have been and continue to be injured as a direct and proximate result of LabCorp's violations of the DTP-CPA.

235.   Plaintiff Khazen and the other members of the Texas Sub-Class either (i) paid LabCorp's bill under duress, (ii) refused to pay LabCorp's bill because of its excessive rates, or (iii) paid LabCorp's bill in reliance on a presumption that LabCorp had billed them the commercially reasonable fair market value.

- 55 -

236.    Plaintiff Khazen is entitled to pursue a claim on behalf of the Texas Sub-Class against LabCorp under Tex. Bus. & Com. Code § 17.50 for actual damages, treble damages, equitable relief, and attorney's fees and costs to remedy LabCorp's violations of the DTP-CPA.

**COUNT VIII**
**Breach of Implied Contract or Quasi-Contract,**
**and for Unjust Enrichment**
**(On behalf of Plaintiffs, the Class and the Sub-Classes)**

237.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

238.    Under the law of North Carolina—or, in the alternative, the law of each Plaintiff's state of residence at the applicable time—an implied contract exists between LabCorp and each of the Plaintiffs, as well as each member of the national Class and each Sub-Class, whereby there is a mutual understanding that LabCorp is providing laboratory testing services in exchange for payment equal to the fair market value of its services.

239.    Additionally, if a patient is insured and their insurer denies coverage for the tests performed (in whole or in part), the patient would then be accountable for the fair market value of those specific tests, equal to the fair market value rate as described herein (the *quantum meruit* of the services performed), which would be substantially similar to the rate the patient's insurer would have paid had the lab services been covered.

240.    LabCorp breached the terms of the implied contract by billing Plaintiffs

and other members of the national Class at excessive chargemaster rates that were multiple times higher than the fair market value rates, as agreed to between LabCorp and Benefit Plans, or as otherwise applicable to Plaintiffs and the Class.

241. By virtue of LabCorp's breach of the implied contract, LabCorp was unjustly enriched to the detriment of Plaintiffs and the members of the national Class. Plaintiffs and the Class thereby sustained monetary damages.

242. LabCorp should be compelled to provide restitution, and to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and the national Class, all proceeds received by LabCorp from Plaintiffs and the Class as a result of any unlawful or inequitable act described herein, which has inured and continues to inure to the unjust enrichment of LabCorp.

243. LabCorp should also be enjoined from continuing to engage in any unlawful or inequitable methods, acts and/or practices as alleged herein.

## COUNT IX
### Common Law Fraud (in the Alternative)
### (On behalf of Plaintiffs, the Class and the Sub-Classes)

244. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

245. In the alternative to the allegations of unfair and deceptive trade practices, Plaintiffs allege that LabCorp intentionally, knowingly, willfully and recklessly charged and collected fees for laboratory testing and other services in excess of the fair market value rates it was entitled to.

246. On its invoices, LabCorp does not identify claims that are rejected by

- 57 -

Benefit Plans, the amount Benefit Plans pay for individual lab tests, what portion of the charged amounts patients are paying for individual lab tests (whether some or all), and what amount the Benefit Plan would pay for lab tests had it not rejected the claim. LabCorp also fails to identify the CPT codes for the individual lab tests it purports to have performed

247.    LabCorp misused its position of superior knowledge and financial strength to defraud and induce consumers into paying bills and costs LabCorp knew were excessive and beyond the fair market value rates of its services.

248.    Certain Plaintiffs and the other members of the national Class and Sub-Classes were compelled to pay these bills in reliance upon the various statements, and representations and omissions of material fact made by LabCorp.  These statements, representations, and omissions were made for the purpose of inducing reliance thereon by Plaintiffs and the members of the Class and Sub-Classes to pay fees in an amount LabCorp was not entitled to.

249.    Plaintiffs and the other members of the Class and Sub-Classes had a right to rely on, and did reasonably rely on, LabCorp's statements, misrepresentations, and omissions.

250.    Each of LabCorp's misrepresentations and omissions were material, in that Plaintiffs and the members of the Class and Sub-Classes would not have paid the improper fees and charges if they had known that the statements and representations of LabCorp were false, misleading, incomplete, unfair and untrue.

251.    Each of the misleading statements, misrepresentations, and omissions

- 58 -

made by LabCorp, as identified herein, were false, misleading, incomplete, and untrue, and were known or should have been known by LabCorp to be false, misleading, incomplete, and untrue when made. Each misleading statement, misrepresentation, and omission was made with intent to deceive and defraud, or to conceal the truth about LabCorp's deceptive billing practices, or with disregard for its truth or completeness, or in spite of the fact that it was untrue. Each misleading statement, misrepresentation, and omission was made to induce Plaintiffs and the members of the Class and Sub-Classes to pay LabCorp's fees and charges well above the fair market value rate.

252.    Plaintiffs and the other members of the Class and Sub-Classes had no knowledge of the falsity, incompleteness, or untruthfulness of LabCorp's statements and representations when they paid their bills to LabCorp.

253.    By reason of LabCorp's misleading statements, misrepresentations, and omissions, Plaintiffs and the other members of the Class and Sub-Classes suffered financial injuries.

254.    Moreover, the conduct of LabCorp in perpetrating the fraud described above was malicious, willful, wanton, and oppressive, or in reckless disregard of the rights of Plaintiffs and the other members of the Class and Sub-Classes, thereby warranting the imposition of punitive damages against LabCorp.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against LabCorp as follows:

A.    Certifying the Class and Sub-Classes pursuant to Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure,

- 59 -

certifying Plaintiffs as representatives of the Class and the respective Sub-Classes, and designating their counsel as counsel for the Class and for the Sub-Classes;

B.    Declaring that LabCorp has engaged in the unlawful and inequitable conduct alleged herein;

C.    Awarding Plaintiffs, the Class and the Sub-Classes damages for their claims;

D.    Awarding Plaintiffs, the Class and the Sub-Classes statutory and exemplary damages where permitted;

E.    Awarding Plaintiffs, the Class and the Sub-Classes punitive damages;

F.    Ordering LabCorp to disgorge into a common fund or a constructive trust all monies paid by Plaintiffs, the Class and the Sub-Classes to the full extent to which LabCorp was unjustly enriched by their unlawful and inequitable conduct alleged herein;

G.    Permanently enjoining LabCorp from continuing to engage in the unlawful and inequitable conduct alleged herein;

H.    Granting Plaintiffs, the Class and the Sub-Classes the costs of prosecuting this action and reasonable attorney's fees; and

I.    Granting such other relief as this Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs, the Class and the Sub-Classes demand a trial by jury on all issues so triable.

Dated:  October 10, 2017

ELLIS & WINTERS LLP

/s/ Jonathan D. Sasser

Jonathan D. Sasser
N.C. State Bar No. 10028
Jeremy M. Falcone
N.C. State Bar No. 36182
P.O. Box 33550
Raleigh, North Carolina 27636
Telephone Number: (919) 865-7000
Facsimile Number: (919) 865-7010
jon.sasser@elliswinters.com
jeremy.falcone@elliswinters.com

*Liaison Counsel for Plaintiffs*

OF COUNSEL

Robert C. Finkel
Joshua W. Ruthizer
Sean M. Zaroogian
WOLF POPPER LLP
845 Third Avenue, 12th Floor
New York, New York 10022
Telephone Number: (212) 759-4600
Facsimile Number: (212) 486-2093
rfinkel@wolfpopper.com
jruthizer@wolfpopper.com
szaroogian@wolfpopper.com

*Counsel for Plaintiffs*